UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DWAYNE CONYERS, | Case No.: 17cv0127-LAB (AHG) |
| Plaintiff, | **ORDER GRANTING MOTION FOR SUMMARY JUDGMENT** |
| v. | |
| CORPORAL MICHAEL RODDY, | |
| Defendant. | |

Plaintiff Dwayne Conyers is a California state prisoner proceeding by and through counsel with a Fifth Amended Complaint pursuant to 42 U.S.C. § 1983. (Electronic Case File "ECF" No. 51.) He claims that while in custody of the San Diego County Sheriff's Department awaiting trial for a criminal offense, and while hospitalized as a result of a prescription medication overdose, he was sexually assaulted and harassed by Defendant San Diego County Sheriff's Deputy Corporal Michael Roddy. (ECF No. 51-1 at 1-2.)

Currently pending is a Motion for Summary Judgment by Defendant Roddy. (ECF No. 89.) Defendant contends there is no genuine issue of material fact in dispute because: (1) the forensic evidence proves Plaintiff's allegations are false, (2) eyewitness and expert medical evidence show he was hallucinating and delusional due to his overdose or mental illness, (3) his allegation that Defendant entered a continuously monitored room in a heavily trafficked area of a hospital and assaulted him unnoticed for 10-15 minutes while

he was pressing an emergency call button is implausible, and (4) Plaintiff lied to the investigating detectives and has changed his story multiple times. (*Id*.)

Plaintiff opposes summary judgment, arguing the chain of custody of the forensic evidence is compromised and not all evidence was tested, and that his sworn deposition testimony raises genuine issues of material fact. (ECF No. 92.)

Defendant replies that the chain of custody of the forensic evidence is intact, all relevant evidence was tested, and Plaintiff's deposition testimony fails to raise a genuine issue because it does not refute Defendant's evidence. (ECF No. 93.)

For the following reasons, the Court **GRANTS** summary judgment in favor of Defendant Roddy.[1]

## I.  Procedural Background

Plaintiff initiated this action by filing a *pro se* Complaint on December 15, 2016 in the Central District of California naming as Defendants San Diego County Sheriff's Deputy Corporal Rodriguez, a John Doe Nurse and two John Doe San Diego County Sheriff's Deputies. (ECF No. 1.)  The Complaint was transferred to this Court on January 19, 2017.  (ECF No. 6.)  Plaintiff named the same Defendants in a First Amended Complaint filed March 30, 2017, and a Second Amended Complaint filed May 18, 2017. (ECF Nos. 16, 23.)

On August 18, 2017, the Court granted Plaintiff's Motion for appointment of counsel. (ECF No. 31.)  Plaintiff's appointed counsel filed a Third Amended Complaint on January 19, 2018 (ECF No. 36), and a nearly identical Fourth Amended Complaint on January 22, 2018.  (ECF No. 38.)  Those complaints named as Defendants San Diego County, the San Diego County Sheriff's Department, and San Diego County Sheriff's Deputies Michael Roddy and Luciano Rodriguez.  (ECF No. 38 at 2.)

---

[1]  Although this motion was referred to United States Magistrate Judge Alison H. Goddard pursuant to 28 U.S.C. § 636(b)(1)(B), the Court has determined that neither a Report and Recommendation nor oral argument is necessary for the disposition of this matter.  *See* S.D. Cal. Civ.L.R. 72.1(d).

On May 25, 2018, the Court granted a motion to dismiss by San Diego County and the San Diego County Sheriff's Department and dismissed those Defendants without prejudice and with leave to amend. (ECF No. 50.) On June 9, 2018, Plaintiff filed a Fifth Amended Complaint, the operative pleading in this action, naming as the sole Defendant San Diego County Sheriff's Deputy Corporal Michael Roddy.[2] (ECF No. 51.)

Defendant Roddy filed a Motion to Dismiss on July 20, 2018, which was denied on September 18, 2019, and filed an Answer on November 2, 2018. (ECF Nos. 56, 60, 62.) He filed the instant Motion for Summary Judgment on September 30, 2019. (ECF No. 89.) Plaintiff filed an Opposition on October 24, 2019. (ECF No. 92.) Defendant filed a Reply on November 7, 2019. (ECF No. 93.)

## II. Plaintiff's Allegations

Plaintiff alleges that on June 24, 2016, while he was in the custody of the San Diego County Sheriff's Department awaiting trial in a criminal case in the San Diego County Superior Court, he was transported to the Tri-Care Medical Center in Oceanside, California, and admitted for Dilantin poisoning. (ECF No. 51-1 at 1.) At some unidentified time during his hospitalization:

> Defendant Roddy entered Plaintiff's hospital room while Plaintiff was handcuffed to the bed, and Defendant Roddy then approached Plaintiff, looked Plaintiff in the eyes, uttered the racial epithet "nigga", and said to Plaintiff, "Shut up, I'll blow your head off" and "You['d] better do what I say." [¶] Immediately after Defendant Roddy issued the aforementioned verbal orders, Defendant Roddy touched Plaintiff's buttocks, exposed Defendant Roddy's penis, masturbated Defendant Roddy's penis, ejaculated onto Plaintiff's bed sheets, and left Plaintiff's room. By the time that Defendant Roddy departed Plaintiff's room, Plaintiff activated an emergency button on the side of his bed.

(*Id.* at 1-2.)

---

[2] The caption of the Fifth Amended Complaint lists Does 1-100 as Defendants but Plaintiff has never identified the Doe Defendants by name nor provided any other identifying factors, and has never moved to substitute the true names for the Does. Accordingly, Defendant Roddy is the only remaining Defendant in this action.

Plaintiff alleges Defendant Roddy was acting under color of state law and within the scope of his employment. (*Id.* at 2.) Plaintiff presents a single count for violation of his Fourteenth Amendment rights to privacy and to be free of sexual harassment, sexual assault and sexual battery. (ECF No. 92 at 3.)

## III.  Discussion

Defendant Roddy seeks summary judgment on the basis that: (1) forensic testing found no semen on the bedsheet, (2) eyewitness and expert medical testimony show Plaintiff was hallucinating and delusional during the alleged events, (3) police reports and declarations show he provided false information to law enforcement on the night of the incident and has changed his story multiple times, and (4) declarations from hospital staff show such an assault could not have gone unnoticed by staff because his room was continuously monitored in a heavily trafficked area of the hospital. (ECF No. 89.)

Plaintiff opposes summary judgment, contending the chain of custody of his bedsheets was compromised and there remains a genuine issue whether Defendant ejaculated on them, and Plaintiff's deposition testimony is sufficient to raise genuine issues of material fact because credibility determinations are not permitted on summary judgment. (ECF No. 92.)

Defendant replies that the chain of custody of the bedsheets is intact, and Plaintiff's contention that unspecified portions of his deposition testimony raise genuine issues for trial fails notwithstanding the prohibition on credibility determinations because his deposition testimony does not refute Defendant's evidence. (ECF No. 93.)

### A.  Legal Standards

Defendant is entitled to summary judgment if he demonstrates "there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party has the initial burden of showing summary judgment is proper "by showing the absence of a genuine issue as to any material fact." *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). Entry of summary judgment is appropriate "against a party who fails to make a showing sufficient to establish the

17cv0127-LAB (AHG)

existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

In order to avoid summary judgment, the nonmovant must present "specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). The Court may not weigh evidence or make credibility determinations, and any inferences drawn from the underlying facts must be viewed in the light most favorable to the nonmoving party. *Id*. at 255. The nonmovant's evidence need only be such that a "jury might return a verdict in his favor." *Id*. at 257.

**B. Arguments and evidence in support and opposition to summary judgment**

**1. Defendant's Motion for Summary Judgment**

Defendant Roddy presents a San Diego County Sheriff's Department Crime/Incident Report by Deputy Sheriff Luciano Rodriguez stating that he was assigned to the Tri-City Medical Center Hospital as a Floor Rover/Escort on June 25, 2016. (ECF No. 89-2 at 8-10.) About 6:45 p.m. that evening, Plaintiff, who was talking rapidly and incoherently, told Deputy Rodriguez he had been raped by a black corporal earlier that morning. (*Id*. at 8.) Deputy Rodriguez reported the rape allegation to Vista Detention Watch Commander Lieutenant Ausler and was instructed to obtain further details. (*Id*.) About 7:05 p.m. Deputy Rodriguez asked Plaintiff what happened, and he said: "The big black corporal came into the room this morning while I was lying in bed, circled around my bed and threw me down. He penetrated me and then he cleaned his dick in my bed sheets." (*Id*. at 8-9.) Plaintiff took his hospital gown out of a pillow case where he had hidden it and asked Deputy Rodriguez to look at his bedsheets but kept showing him the gown. (*Id*. at 9.) Deputy Rodriguez stated that Plaintiff "became very agitated by waving his hands and the gown and making incoherently [sic] statements that I could not understand." (*Id*.) Deputy Rodriguez then interviewed Nurse Marek Gorski who stated that Plaintiff had been in room

303 by himself since his arrival, and room 303 has a live camera feed used to monitor the behavior of patients and inmates but which does not record. (*Id*.) Nurse Gorski told Deputy Rodriguez that beginning about 4:00 p.m. that day Plaintiff began accusing anyone who entered his room of rape, and was very agitated and threw things on the floor, but after he took his medication he "calmed down, apologized and said he hears voices in his head that are telling him he is being raped." (*Id*.)

Deputy Rodriguez was told by Deputy James Clark that about 1:00 a.m. on June 26, 2016, Deputy Clark and Nurse Roman Manongsong entered Plaintiff's room to change his linens and allow him to brush his teeth. (*Id*. at 10.) Deputy Clark said that when Plaintiff began to brush his teeth "he started yelling and screaming and had a conversation by himself with an imaginary entity." (*Id*.) Nurse Manongsong told Deputy Rodriguez the hospital notified the Poison Control Center because Plaintiff had such a high level of Dilantin in his blood, and that high levels of Dilantin cause confusion and hallucinations, both of which were observed in Plaintiff's behavior. (*Id*. at 10.) About 6:00 a.m., Deputy Rodriguez spoke to Defendant Roddy, who he thought might be the person Plaintiff was accusing because he was the only black corporal on duty when Plaintiff claimed he was raped. (*Id*.) Defendant Roddy said he had not talked to Plaintiff all shift, and that he had been in his room only once during his shift when he escorted Nurse Gorski into the room, but Plaintiff started yelling and screaming incoherently so Defendant Roddy asked Nurse Gorski to come back later and they both left the room at the same time. (*Id*.)

Defendant presents a San Diego County Sheriff's Department Crime/Incident Report by San Diego County Sheriff's Detective Michele Vars stating that she and Detective Snelling arrived at the hospital around 10:00 p.m. on June 25, 2016 and spoke with Deputy Rodriguez. (*Id*. at 14.) They interviewed Plaintiff and recorded the interview without his knowledge. (*Id*.) An audio recording of the interview and corresponding transcript is in the record. (*Id*. at 37-59.) Plaintiff said a black corporal stood outside his room while another black corporal entered the room, hit him on the head, told him to shut up, threw him on the bed, anally raped him, and "wiped himself and threw whatever was

left on the sheet." (*Id*. at 14-15.) Plaintiff pointed to a pillowcase and said the sheet which the corporal ejaculated on was in the pillowcase. (*Id*. at 15.) Detectives Vars collected as evidence a pillowcase containing Plaintiff's gown and the sheet he said the deputy had ejaculated on and assigned it evidence item #1.000, collected a mattress sheet from his bed and assigned it evidence item #2.000, and obtained his permission to conduct a Sexual Assault Response Team ("SART") examination. (*Id*. at 16; ECF No. 89-13 at 3.)

The detectives interviewed Plaintiff again a few minutes after the evidence was collected, this time informing him the interview would be recorded. (ECF No. 89-2 at 16.) An audio transcript of the interview and corresponding transcript are in the record. (*Id*. at 61-80.) Plaintiff said his anus had not been penetrated by the black corporal's penis and he had not been touched, but then said the black corporal had touched his buttocks and had masturbated and ejaculated onto his bedsheets. (*Id*. at 16-17.) Detective Vars collected a DNA swab from Plaintiff and told him because he was no longer alleging rape a SART examination would not be performed. (*Id*. at 17.) Detective Vars concluded her report by stating that based on the statements taken, and Plaintiff's medical and mental status and his changing accounts: "I do not believe Corporal Roddy or any other peace officer raped, masturbated or inappropriately touched Conyers for sexual gratification." (*Id*.) As detailed below, Defendant presents declarations from Deputies Clark, Rodriguez and Roddy, Detectives Vars and Snelling, and Nurses Gorski and Manongsong confirming the events and observations set forth in the foregoing police reports. (ECF Nos. 89-3, 89-8, 89-10, 89-11, 89-12, 89-12, 89-15.)

Defendant presents a forensic case report from Bode Technology produced at the request of Plaintiff's attorney which states that a "sheet" taken from a pillowcase and assigned evidence item #1.000 tested negative for semen, and a hospital bed "mattress sheet" assigned evidence item #2.000 tested negative for seminal fluid. (*Id*. at 31.) Defendant has lodged portions of Plaintiff's deposition transcript in which, as detailed below, he states the assault lasted 10 to 15 minutes, he was pressing the emergency call button the entire time, the officer who assaulted him had short hair and was pointing his

gun at him with one hand while masturbating with the other, and acknowledging he might have initially reported that he had been raped. (ECF No. 89-2 at 128-71.)

Defendant presents declarations from Defendant Roddy, Deputy Rodriguez and their supervisor San Diego Sheriff's Deputy Sergeant Carl Spregelmeyer, along with Tri-City Medical Center business records, which indicate Defendant Roddy left the hospital at 4:00 p.m. on June 25, 2016 and Deputy Rodriguez came on duty at 6:00 p.m. that day. (ECF No. 89-2 at 33; ECF No. 89-3 at 1-3; ECF No. 89-10 at 1-4; ECF No. 89-16 at 1-3.) Defendant argues that evidence shows Plaintiff could not have seen the two deputies together as he claims. (ECF No. 89-1 at 22-23.)

Defendant presents declarations from staff at Tri-City Medical Center, including Nurses Gorski and Manongsong and their supervisor Nurse Lori Roach stating that Plaintiff's room is located near the nurse station, the assistant manager's office, the case manager's office, and the restrooms, that it is in one of the most heavily trafficked areas of the hospital where 4-5 deputies are usually on guard along with as many as 15-20 California Department of Corrections and Rehabilitation officers, that his room is monitored 24 hours a day by live video feed at the nurse station, and that while Plaintiff was in the hospital he had used the emergency call button but never to summon help while being bothered by a deputy. (ECF No. 89-9 at 1-3; ECF No. 89-12 at 1-3; ECF No. 89-15 at 1-2.) Defendant Roddy argues it is implausible a deputy could have entered the room and stayed for more than a few moments before being observed, much less for the 10-15 minutes Plaintiff claims he was in his room while Plaintiff was pressing the emergency call button the entire time. (ECF No. 89-1 at 23-24.)

Defendant presents eyewitness testimony and medical evidence showing Plaintiff was delusional, hallucinating and severely confused at the time of the alleged incident, and argues his allegations are therefore not reliable, believable, accurate or even plausible. (ECF No. 89-1 at 25-28.) He presents excerpts from the deposition of Dr. Minh Nguyen, the admitting physician when Plaintiff arrived at the hospital on the evening of June 24, 2016, who diagnosed him upon admission with acute toxic encephalopathy and Dilantin

toxicity, and noted a chief complaint of "altered mental status" with symptoms of confusion and agitation due to ingestion of more than triple his daily dose of Dilantin. (ECF No. 89-2 at 179-83.) Dr. Nguyen noted Plaintiff was at that time taking Risperdal, a psychotropic medication used to treat manic patients, and Zoloft, an anti-depressant used to treat depression and bipolar disorder. (*Id*. at 180-81.) Dr. Nguyen found the Dilantin in Plaintiff's system was at a level where a patient would experience symptoms of dizziness, lightheadedness, unsteady gait, double vision, confusion and agitation. (*Id*. at 183, 188.) Dr. Nguyen reported Plaintiff was still suffering from acute toxic encephalopathy and Dilantin toxicity during a follow-up visit two days later, and that the level of Dilantin in his system had increased since the first visit. (*Id*. at 192-93.)

Defendant presents declarations from six eyewitness, Nurses Manongsong and Gorski, Deputies Clark and Rodriguez, and Detectives Vars and Snelling, stating that Plaintiff was incoherent, manic, hearing voices and hallucinating. (ECF No. 89-1 at 26-27; ECF No. 89-8 at 1-2; ECF No. 89-10 at 2-4; ECF No. 89-11 at 3; ECF No. 89-12 at 2; ECF No. 89-13 at 4; ECF No. 89-15 at 2.) He presents the declaration of Deputy Osmark Gonzalez who states that on July 1, 2016, while Plaintiff was housed at George Bailey Detention Facility after his return from the hospital, he escorted Plaintiff to a medical evaluation with Dr. Purviance attended by Nurse Ko Kwan where Plaintiff made incoherent statements about being sexually molested by "Colonel Rodriguez," and that Dr. Purviance found him to be in an altered state of mind. (ECF No. 89-14 at 1-2.) Deputy Gonzalez states that Plaintiff was seen by Dr. Redburn less than two hours later and found to be psychotic. (*Id*. at 2.)

Finally, Defendant presents the declaration of Dr. Richard Clark, a toxicologist retained as an expert witness, who opines, based on his review of the medical records, that Plaintiff was suffering severe Dilantin toxicity when admitted on June 24, 2016 until his discharge on June 29, 2016. (ECF No. 89-5 at 1-3.) Dr. Clark states he believes to a "reasonable medical probability" that Plaintiff's Dilantin toxicity caused or contributed to the delusions, paranoia, hallucinations, confusion and agitation observed in his behavior

during his hospital stay, and "his claim of being sexually molested is most likely related to a hallucination or delusion[al] belief related to his [Dilantin] toxicity, perhaps coupled with psychiatric disorders and other medical problems." (*Id*. at 3.)

## 2. Plaintiff's Opposition

Plaintiff first challenges the forensic evidence that the bedsheets tested negative for semen. (ECF No. 92 at 7.) He argues Detective Vars violated chain of custody protocol by storing the bedsheets and hospital gown in her desk drawer for 19 days prior to sending them out for testing, and that the "negative testing contention is impeached" by the use of the term "fitted sheet" by the attorneys in the joint statement of undisputed facts rather than the terms "bed sheet" or "flat sheet" used by Detective Vars when she impounded them. (*Id*.) He contends Defendant Roddy's semen was deposited on a bed sheet or flat sheet, yet a "fitted sheet" was tested for semen, and it is common knowledge hospitals do not use fitted sheets, only flat sheets. (*Id*.) He contends a genuine issue of material fact remains as to whether Defendant Roddy ejaculated onto his bedsheets. (*Id*.)

Plaintiff also contends his deposition testimony creates a genuine issue of material fact because his credibility cannot be challenged on summary judgment. (*Id*. at 8-9.) He described the incident at his deposition as follows:

> Corporal Roddy stopped in front of my bed. He whispers into the other black deputy's ear. The black deputy goes to the hallway. Corporal Roddy comes to my bed. He placed his hand on his gun. His gun would be to the door, going this way because we wears it right here. Okay. I got this little cheap nightgown on from the hospital. He touched my buttocks. He said, "Nigger, shut up. I'll blow your motherfucking head off. You better do what I say."

> I never in my life been in this hospital. Somebody gets on the intercom and coaches him throughout the whole assault. The assault takes place for 10 to 15 minutes. Corporal Roddy unzips his pants, ejaculates on my bed. Why wasn't his semen on those sheets? I don't have a clue, but at the same time he went - he the [sic] ejaculated on them sheets.

(ECF No. 89-2 at 139-40.)

Plaintiff said in his deposition he was lying on his side watching television when Defendant Roddy, who he described as having short hair, touched his left buttock under his gown with one hand for "a quick second." (*Id*. at 136, 144-47, 152.) Defendant Roddy held his gun in one hand pointing it at Plaintiff while he masturbated in front of him with the other hand and ejaculated on his bedsheet. (*Id*. at 158.) He said the other black deputy "must have went to the camera room because he coached the whole sexual assault." (*Id*. at 143.) Plaintiff said a man was coaching Defendant Roddy during the entire incident by talking over a loudspeaker or intercom connected to the video system monitoring his room, but he could not identify him. (*Id*. at 150.) He said he began pressing the emergency call button as soon as Defendant Roddy approached him and continued pressing it the entire time but no one ever responded, said there is "a big picture window" in the wall of his room from which one "can't help but see" what is happening in the corridor, and that he did not know if the door to his room was open or closed during the incident. (*Id*. at 143-44, 159, 166.) He said that about 30 minutes after the assault a nurse and a red-headed deputy came to his room and were there for about a minute or two before Deputy Rodriguez, who Plaintiff knew from being escorted to court in the past, walked past his room while Defendant Roddy walked past the other way. (*Id*. at 159-62.) Plaintiff shouted to Deputy Rodriguez that Defendant Roddy had assaulted him, and "about four deputies grabbed [Defendant Roddy] and pulled him down the hallway." (*Id*.)

Plaintiff said he told everyone at that time he had been sexually assaulted, but "everybody else was yelling 'rape, rape, rape, rape, rape, rape.' So I could have probably said 'rape' too." (*Id*. at 162-63.) Plaintiff stated that Defendant Roddy "showed his guilt" by jumping up and down repeatedly saying: "I didn't do it," because an innocent man would have been taciturn when faced with such an allegation. (*Id*. at 165-69.)

Plaintiff also submits his own declaration in opposition to summary judgment, dated October 13, 2019, about three months after his July 23, 2019 deposition. (ECF No. 92-1.) He states he never at any time reported he had been raped or anally penetrated, and the statements by Deputy Rodriguez, Nurse Gorski and Detectives Snelling and Vars that he

made such reports are false. (*Id.* at 6, 9-11.) He claims Nurse Manongsong falsely stated he was hallucinating. (*Id.* at 9.)

### 3. Defendant's Reply

Defendant presents declarations from Senior Deputy County Counsel Stacey Liberatore and Laura Dolan who state that no "fitted sheet" was taken into evidence or tested by Bode Technology as Plaintiff contends, and the term "fitted sheet" was used only by them when coordinating transmission of the sheets to the laboratory for testing. (ECF No. 93-1 at 1-5; ECF No. 93-2 at 1-3.) Defendant argues that everyone who actually handled the sheets, including Detectives Vars and Snelling, San Diego County Sheriff's Department Property/Evidence Unit Evidence Custodian Flavio Alfaro, and Bode Technology forensic analyst Dywayne Martin, all of whom present declarations, never used the term "fitted" or "flat" sheet, that only the attorneys involved in the case used those terms, and that Bode Technology received and tested the sheets which were taken into evidence at the hospital. (ECF No. 93 at 5-7.) Defendant presents photographs of the bed sheets taken by the police and by the testing laboratory, and, as detailed below, relies on declarations and Bode Technology documents to demonstrate the chain of custody of the sheets is unbroken and the sheets seized were the ones tested. (*Id.* at 5-8; ECF No. 93-3 at 3, 5-7; ECF No. 89-2 at 19-27.) Defendant Roddy presents his own declaration denying Plaintiff's allegations and stating he is, and was at the time of the alleged assault, completely bald with no hair on his head. (ECF No. 89-3 at 2-3.)

Defendant also challenges Plaintiff's contention that his deposition testimony raises a genuine issue of material fact, arguing that his testimony does not refute Defendant's evidence that: (1) he admitted providing false information to law enforcement during their investigation of his complaint, (2) he admitted changing his story multiple times, (3) he was in a severely confused, altered mental state at the time of the alleged incident and for some time later, and (4) an expert toxicologist opined that his claims are likely the result of hallucinations and delusions caused by Dilantin poisoning. (ECF No. 93 at 8-11.) Defendant argues Plaintiff has presented no evidence to rebut the evidence that Plaintiff

misidentified Defendant Roddy as the assailant, if there was one, that Deputy Rodriguez and Defendant Roddy were not working at the same time when Plaintiff claims they were, or that it is not possible a 10-15 minute sexual assault in Plaintiff's room could have gone unnoticed by hospital staff. (*Id.*)

### C. Defendant is Entitled to Summary Judgment

Plaintiff presents a single count for violation of his Fourteenth Amendment rights to privacy and to be free of sexual harassment, sexual assault and sexual battery while he was in the custody of the San Diego County Sheriff awaiting trial. (ECF No. 92 at 3.) Because Plaintiff was a pretrial detainee at the time of the alleged events, his rights are protected by the Due Process Clause of the Fourteenth Amendment. *Bell v. Wolfish*, 441 U.S. 520, 535 n.16 (1979). "Sexual misconduct by a police officer toward another generally is analyzed under the Fourteenth Amendment, sexual harassment by a police officer of a criminal suspect during a continuing seizure is analyzed under the Fourth Amendment." *Fontana v. Haskin*, 262 F.3d 871, 882 (9th Cir. 2001); *see also Reed v. Hoy*, 909 F.2d 324, 329 (9th Cir. 1990) ("[C]laims arising before or during arrest are to be analyzed exclusively under the Fourth Amendment's reasonableness standard rather that the [Fourteenth Amendment's] substantive due process standard."), overruled on other grounds by *Edgerly v. City and County of San Francisco*, 559 F.3d 946, 956 n.14 (9th Cir. 2010).

Under the Fourteenth Amendment, "the threshold question is 'whether the behavior of the governmental officer is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience.'" *Fontana*, 262 F.3d at 882 n.7, quoting *County of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998). The "unreasonable, non-consensual, inappropriate touching" of a "helpless, handcuffed, and frightened" person by a peace officer violates the Fourth Amendment. *Fontana*, 262 F.3d at 880. Under the Eighth Amendment, "[a] sexual assault on an inmate by a guard . . . is deeply offensive to human dignity." *Schwenk v. Hartford*, 204 F.3d 1187, 1197 (9th Cir. 2000), *see e.g. Hill v. Rowley*, 658 Fed.Appx. 840, 841 (9th Cir. 2016) (holding that an allegation that a prison official gripped an inmate's buttock with sexual intent states an Eighth Amendment claim).

Accordingly, Plaintiff's allegations that Defendant Roddy, while acting in his capacity as a Deputy Sheriff, touched Plaintiff's left buttock with sexual intent, masturbated in front of him and ejaculated onto his bedsheets, all while Plaintiff was handcuffed to the bed and pressing the emergency call button for help, if proven, would constitute evidence such that a "jury might return a verdict in his favor" on his 42 U.S.C. § 1983 claim for a violation of his rights under the United States Constitution. *Anderson*, 477 U.S. at 257; *Devereaux v. Abbey*, 263 F.3d 1070, 1074 (9th Cir. 2001) ("Section 1983 creates a private right of action against individuals who, acting under color of state law, violate federal constitutional or statutory rights.")

### 1. Defendant has carried his burden of showing an absence of a genuine issue of material fact in dispute

For the following reasons, Defendant Roddy has satisfied his initial burden of showing "the absence of a genuine issue as to any material fact." *Adickes*, 398 U.S. at 157. In order to avoid summary judgment, Plaintiff must present "specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256. The Court may not weigh evidence or make credibility determinations, and any inferences drawn from the facts must be viewed in the light most favorable to the nonmoving party. *Id*. at 255. Plaintiff's evidence need only be such that a "jury might return a verdict in his favor." *Id*. at 257.

Beginning with the forensic evidence, Plaintiff contends the references to "fitted sheet" used by the attorneys litigating this case rather than the proper nomenclature of "flat sheet" and "mattress sheet" used by the Detectives who seized the sheet and the laboratory testing personnel, renders it is unclear whether both sheets from Plaintiff's bed were tested. (ECF No. 92 at 4.) He also contends the chain of custody is broken because Detective Vars stored the evidence in her desk drawer for 19 days before sending it to the testing laboratory. (*Id*.) These contentions have no merit.

In his initial interview with Detectives Vars and Snelling, which was recorded without Plaintiff's knowledge, Plaintiff reported that a tall black corporal entered his room, hit him on the head, turned him over, took his gown off, penetrated his anus with his penis

by thrusting either three or four times or six or seven times, and wiped his penis on the bedsheet after ejaculating on the sheet, all while another black officer stood in the doorway and watched. (ECF No. 89-2 at 43-47.) Plaintiff agreed to undergo a SART examination. (*Id*. at 53.) Detective Vars states in her declaration that she and Detective Snelling left the room, retrieved evidence bags from Snelling's car, returned to the room and collected as evidence a pillow case in which Plaintiff had placed a bedsheet and his gown, which she assigned evidence item #1.000, and a mattress sheet which she assigned evidence item #2.000. (ECF No. 89-13 at 3.) Defendant presents an incident report indicating that a "bed sheet, hospital gown and pillow case" were seized from Plaintiff's room and assigned evidence code #1.000, a "mattress sheet" was seized and assigned evidence code #2.000, and an oral DNA swab from Plaintiff was seized and assigned evidence code #3.000. (ECF No. 89-2 at 13.) Photographs taken by the police and by Bode Technologies of the sheets, gown and pillowcase are attached to the summary judgment motion. (*Id*. at 18-29.)

Detective Vars states in her declaration that while she was collecting the sheets and gown, Plaintiff spontaneously told her he had not been raped, after which she left the room, gave Detective Snelling the evidence, returned to the room with a voice recorder and told Plaintiff the interview was going to be recorded. (*Id*.) During that interview Plaintiff stated that the tall black corporal walked around his room but did not touch him or rape him, and that the other black officer was standing in the doorway watching as the tall black corporal masturbated and ejaculated on the sheet which he had just given the detectives as evidence. (ECF No. 89-2 at 66-69.) Although Plaintiff first said the officer did not touch him, he later said the officer touched his butt cheek once with his hand without penetrating his anus with his finger. (*Id*. at 66-67, 72, 75.) Detective Vars collected a DNA swab from Plaintiff's mouth and told him a SART examination would not be performed because he was no longer alleging penetration. (*Id*. at 70-72.)

Defendant presents the declaration of Laura E. Dolan, a Senior San Diego County Deputy County Counsel, indicating she sent evidence items #1.000 and #2.000 to Bode Technology for testing at Plaintiff's request. (ECF No. 93-1 at 3.) Although the bedsheet

in evidence item #1.000 is referred to in the seizure report as a "sheet" and the bedsheet in evidence item #2.000 is referred to in the seizure report as a "mattress sheet," in her submission to Bode Technology she "mistakenly referred to the 'bed sheet' described in Property Item #1.000 as a 'flat sheet' and the 'mattress sheet' described in Property Item #2.000 as a 'fitted sheet.'" (*Id*. at 3.) She states she never saw or handled the evidence, and because Plaintiff alleged Defendant had ejaculated on his sheets only the sheets were tested, not the gown or pillowcase. (*Id*. at 3-4.) The two bedsheets were sent to Bode Technologies from the San Diego County Sheriff's Department Property and Evidence Unit on March 12, 2019, and Bode Technology was instructed to maintain the chain of custody at all times. (*Id*. at 5.) The Bode Technology report refers to the bedsheets as a "Sheet" gathered by the inmate in a pillow case and identified as evidence item #1.000, and a "Hospital Bed Sheet, Mattress Sheet" as evidence item #2.000. (ECF No. 89-2 at 31.) The report states no semen was detected in evidence item #1.000, and evidence item #2.000 tested negative for seminal fluid but was not tested for semen. (*Id*.)

Defendant presents the declaration of Stacey Liberatore, a San Diego County Senior Litigation Investigator, who states she was involved in procuring cost estimates for testing the bedsheets. (ECF No. 98-2 at 1-2.) She states that in her communications with Bode Technology she referred to the items as a "flat sheet" and "fitted sheet" as a "simple way of distinguishing between the two sheets" which she never personally saw or handled. (*Id*. at 2.) On March 6, 2019, Liberatore contacted Flavio Alfaro, the Evidence Custodian of the San Diego County Sheriff's Department Property/Evidence Unit and requested he locate items #1.000 and #2.000 and send them via overnight delivery to Bode Technology. (*Id*. at 2-3.) She was informed on or about March 12, 2019 by Alfaro that he had sent items #1.000 and #2.000 to Bode Technology via Federal Express overnight delivery. (*Id*. at 3.)

Accordingly, there is no merit to Plaintiff's contention that the references to "fitted sheet" by the attorneys litigating this case renders it unclear whether both sheets from Plaintiff's bed were tested by Bode Technology. (ECF No. 92 at 4.) Detective Vars states that when she left the hospital she placed the evidence in its evidence bag in a locked

drawer of her assigned desk at her office, that the items were later photographed by her office and then turned over to the San Diego Sheriff's Office Property/Evidence Unit on July 14, 2016. (ECF No. 89-13 at 4.) There is no merit to Plaintiff's contention the chain of custody is not intact or resulted in the spoliation of evidence merely because there was a 19-day gap between seizing the items and turning them over to the property unit, or by Detective Vars storing the items in the property bag in which they were originally placed in her locked desk drawer.

To recap with respect to the forensic evidence, Plaintiff initially reported to the police he had been hit in the head and raped. When he was told a SART examination would be performed and his statement would be recorded, he changed his story to a deputy entering his room and masturbating without touching him. He then changed his story to the deputy hitting him on the head and masturbating onto his bedsheet. He finally changed his story to the deputy touching his left buttock with one hand after which he masturbated onto a bedsheet which he retained and personally handed to Detective Vars as evidence. The record supports a finding that the chain of custody of the bedsheet identified by Plaintiff as having been ejaculated upon is intact and that it tested negative for semen. Accordingly, viewing the evidence in the light most favorable to Plaintiff, and drawing any inferences in his favor, Defendant has carried his burden of showing "the absence of a genuine issue as to any material fact" with respect to whether he ejaculated onto Plaintiff's bedsheet. *Adickes*, 398 U.S. at 157.

Defendant next contends Plaintiff has failed to come forward with evidence to show his allegations are not the result of delusions, hallucinations or a confusion of mind which numerous eyewitnesses observed him exhibiting, and which two doctors, a treating physician and an expert witness, have opined are symptoms of Dilantin toxicity. Defendant first presents evidence Plaintiff misidentified Defendant Roddy as his assailant, who he described in his deposition as having short hair. (ECF No. 89-2 at 136.) Defendant Roddy states in his own declaration that he is bald and had no hair on his head on the date in question. (ECF No. 89-3 at 2-3.) Defendant also presents evidence Plaintiff misidentified

Corporal Rodriguez. As set forth below, Plaintiff stated in his deposition he knew Deputy Rodriguez because "he had been taking me to court," and knew his rank was Corporal. (ECF No. 89-2 at 161.) However, Deputy Osmark Gonzalez states that on July 1, 2016, less than a week after the alleged assault, he overheard Plaintiff make incoherent statements about being sexually molested by "Colonel Rodriguez." (ECF No. 89-14 at 1-2.) As set discussed below, Plaintiff states in his declaration in opposition to summary judgment that Deputy Gonzalez is lying, that events which took place a week after the assault are not relevant, and that Defendant Roddy had hair on his head on the day of the incident. (ECF No. 92-1 at 4, 8.) The Court will not make credibility determinations in those respects, but, as will be seen, those disputes do not raise triable issues of fact.

When Plaintiff arrived at the hospital Dr. Nguyen diagnosed him with acute toxic encephalopathy and Dilantin toxicity, noted a chief complaint of "altered mental status" with symptoms of confusion and agitation, and noted he was taking Risperdal, a psychotropic medication used to treat manic patients, and Zoloft, an anti-depressant used to treat depression and bipolar disorder. (ECF No. 89-2 at 170-83.) Dr. Nguyen found the Dilantin in Plaintiff's system was at a level where a patient would experience symptoms of dizziness, lightheadedness, unsteady gait, double vision, confusion and agitation, and he was still suffering from acute toxic encephalopathy and Dilantin toxicity during a follow-up visit two days later. (*Id.* at 183, 188, 192-93.) Nurses Manongsong and Gorski, Deputies Clark and Rodriguez, and Detectives Vars and Snelling all stated that around the time of the alleged assault Plaintiff was incoherent, manic, hearing voices and hallucinating. (ECF No. 89-1 at 26-27; ECF No. 89-8 at 1-2; ECF No. 89-10 at 2-4; ECF No. 89-11 at 3; ECF No. 89-12 at 2; ECF No. 89-13 at 4; ECF No. 89-15 at 2.) In his declaration in opposition to summary judgment, Plaintiff states that Nurse Manongsong's observation that he was hallucinating is false, but he does not dispute or challenge the observations by Nurse Gorski, Deputies Clark and Rodriguez, or Detectives Vars and Snelling that he was delusional and hallucinating. (ECF No. 82-1 at 9.)

/ / /

17cv0127-LAB (AHG)

Dr. Clark, a toxicologist retained as an expert witness, opines that Plaintiff was suffering severe Dilantin toxicity when admitted on June 24, 2016 until his discharge on June 29, 2016. (ECF No. 89-5 at 1-3.) Dr. Clark opines, to a "reasonable medical probability," that Plaintiff's Dilantin toxicity caused or contributed to the delusions, paranoia, hallucinations, confusion and agitation observed in his behavior during his hospital stay, and "his claim of being sexually molested is most likely related to a hallucination or delusion[al] belief related to his [Dilantin] toxicity, perhaps coupled with psychiatric disorders and other medical problems." (*Id*. at 3.) Plaintiff challenges that testimony by observing in his declaration that Dr. Clark never examined him and therefore his opinion is "akin to hearsay," and stating that his anti-psychotic medications were discontinued on June 22 due to his Dilantin overdose. (ECF No. 92-1 at 6, 8.)

Finally, Defendant argues it was impossible for anyone to spend 10-15 minutes in Plaintiff's room sexually assaulting or harassing him with Plaintiff pressing the emergency call button the entire time and another deputy coaching or cheering an assailant on over a loudspeaker or intercom without drawing attention. He presents the evidence detailed above that the room is in a heavily-trafficked area of the hospital with as many as 25 peace officers routinely present, with a large window in his room into the corridor, and under continuous video surveillance from the nearby nurse station where the emergency call button would have alerted nurses or other deputies of an emergency. Plaintiff makes no effort to challenge that evidence.

Accordingly, Defendant Roddy has presented evidence that the bedsheet Plaintiff collected as evidence and turned over to the investigating detectives on which he claims he observed Defendant ejaculate tested negative for semen, has presented evidence that the assault as alleged could not have happened without hospital staff being alerted, which it was not, and has presented evidence that the lack of such evidence, which would be expected to exist if Plaintiff's allegations were true, is explained by medical and eyewitness evidence that he was delusional and hallucinating at the time of the alleged assault due to the overdose for which he was hospitalized which an expert witness testified to a medical

probability caused him to invent the assault, and which he admitted to a nurse that he invented due to his overdose. Defendant has satisfied his initial burden of showing "the absence of a genuine issue as to any material fact" with respect to whether his behavior was "so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience," or that he engaged in "unreasonable, non-consensual, inappropriate" sexual harassment of a "helpless, handcuffed, and frightened" person. *Adickes*, 398 U.S. at 157; *Fontana*, 262 F.3d at 880, 882 n.7; *Lewis*, 523 U.S. at 846.

## 2. Plaintiff has not carried his burden of identifying specific facts showing a genuine issue of material fact for trial

Plaintiff must now come forward with "specific facts showing that there is a genuine issue for trial" in order to avoid summary judgment. *Anderson*, 477 U.S. at 256. He must make "a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322.

He attempts to do so with this sworn deposition testimony stating that he witnessed the assault himself, as well as his sworn declaration in opposition to summary judgment in which he claims some of the eyewitnesses are lying. With respect to Plaintiff's sworn testimony, the Court may not weigh evidence or make credibility determinations, and any inferences drawn from the underlying facts must be viewed in the light most favorable to Plaintiff. *Anderson*, 477 U.S. at 255. Plaintiff need only come forward with evidence such that a "jury might return a verdict in his favor." *Id.* at 257.

Plaintiff testified in his deposition that he may have reported he was raped when he saw Deputy Rodriguez and Defendant Roddy pass each other in front of his room about 30 minutes after the alleged incident, when a nurse and a red-headed deputy had been in his room for about one or two minutes. (ECF No. 89-2 at 159-63.) He is heard in his recorded interview stating numerous times that he was raped. (*Id.* at 44-50.) In his declaration in opposition to summary judgment, dated about three months after his deposition, he categorically denies ever making any allegations of rape to anyone, and says Detectives

20

17cv0127-LAB (AHG)

Vars and Snelling, Nurse Gorski, and Deputy Rodriguez have all falsely stated he did. (ECF No. 92-1 at 9-11.)

"The general rule in the Ninth Circuit is that a party cannot create an issue of fact by an affidavit contradicting his prior deposition testimony." *Kennedy v. Allied Mut. Ins. Co*., 952 F.2d 262, 266 (9th Cir. 1991) ("[I]f a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact.") Plaintiff "is not precluded from elaborating upon, explaining or clarifying prior testimony elicited by opposing counsel on deposition," and "minor inconsistencies that result from an honest discrepancy, a mistake, or newly discovered evidence afford no basis for excluding an opposition affidavit." *Messick v. Horizon Indus*., 62 F.3d 1227, 1231 (9th Cir. 1995).

In categorically stating in his declaration that Nurse Gorski, Deputy Rodriguez and Detectives Vars and Snelling are all lying by stating he initially claimed he was raped (and by implication that Nurse Gorski lied when he said Plaintiff then apologized for falsely claiming rape and admitted he did not know what made him do it), despite the fact that he acknowledged during his deposition testimony he may have made such an allegation, and despite the fact that *an audio recording of him making such an allegation* is in the record, Plaintiff is not elaborating or clarifying his deposition testimony, nor clearing up a mistake or honest discrepancy, but is flatly contradicting his prior sworn deposition testimony. His declaration is unavailable to challenge the evidence he falsely alleged rape because it was executed after his deposition, and because it was executed after the summary judgment motion was filed which itself includes and relies on Plaintiff's recorded interviews. *Kennedy*, 952 F.2d at 266-67 (holding that a court may discount a declaration that "flatly contradicts" earlier deposition testimony).

Nurse Gorski states in his declaration that on the day of the incident Plaintiff "accused multiple African-American deputies" of raping him that day, including any African-American deputy who passed his room without distinguishing between them, and

later apologized and said: "I don't know why I am saying this." (ECF No. 89-12 at 2.) Plaintiff's challenge to that declaration is to claim in his own declaration that Nurse Gorski and anyone who says he made a rape accusation is lying, which contradicts his deposition testimony and his own statements in his recorded interview. Although Plaintiff was asked during his recorded interview if he made that statement to Nurse Gorski, his response is incoherent (ECF No. 89-2 at 46), as are many of his responses to many questions during his interviews and deposition testimony.

Plaintiff admitted in his deposition that: "I don't have a clue" why no semen was found on the bedsheet which he himself handed to the detectives to be taken into evidence. (ECF No. 89-2.) His legal challenge to the chain of custody and testing protocol fails, and he offers no evidence to counter Defendant's expert medical testimony that his statement, which has changed from being raped to being held at gunpoint while an officer masturbated in front of him and ejaculated onto his bed, is a result of delusional and hallucinatory behavior brought on by his Dilantin overdose. Nor has he presented any evidence to challenge Defendant's evidence it was impossible for the alleged assault to have gone unnoticed by hospital staff or passersby, or to counter the numerous eyewitness accounts he was delusional and hallucinating at the time.

The Court acknowledges Plaintiff may well harbor a sincere belief he was sexually assaulted, and there is no question his allegations, if proven, would constitute deplorable and unconstitutional acts by a peace officer. However, he has failed to satisfy his burden of showing there is a genuine issue of material fact in dispute which a trial is necessary to resolve. The only evidence he presents to counter Defendant's evidence that he was observed in a delusional state, hallucinating and accusing every African-American officer who passed his room of rape, and that he apologized for doing so afterward and admitted he had no idea why he made such allegations, is his declaration in opposition to summary judgment in which he claims anyone who says he ever alleged rape is lying, which itself is contradicted by his deposition testimony and his recorded statement making such allegations. As explained above, he cannot create a genuine issue of material fact to the

17cv0127-LAB (AHG)

extent his post-deposition declaration contradicts his deposition testimony acknowledging he may have made such allegations. *See Kennedy*, F.2d at 266 ("[I]f a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact.")

In sum, Defendant has presented evidence that: (1) although Plaintiff claims Defendant ejaculated onto a bedsheet which Plaintiff maintained in his possession and personally handed to detectives as evidence, no semen was found on the sheet, (2) Nurse Gorski heard Plaintiff accuse every African-American deputy who passed his room of rape and heard him later say he had invented allegations of rape without knowing why, (3) the events could not have gone unnoticed by hospital staff and the numerous peace officers routinely assigned to the hospital unit as Plaintiff described it, namely, that a Deputy Sheriff pointed a gun with one hand at a hospital patient and masturbated with the other hand for 10-15 minutes while another deputy coached and encouraged him over an intercom while the patient was pressing an emergency call button the entire time in a room under continuous video surveillance from a nearby nurse station with a large window into the hallway in a busy area of the hospital, and (4) eyewitness and expert medical testimony that Plaintiff's allegations of rape and sexual assault/harassment were the product of hallucinatory and delusional behavior brought on by Dilantin toxicity.

Rather than "present specific facts showing that there is a genuine issue for trial," Plaintiff admitted in his deposition he does not know why the bedsheets tested negative for semen, told Nurse Gorski he did not know what made him falsely accuse people walking past his room of rape, and provides no facts to counter the eyewitness and expert testimony that his allegations are the product of a confused state of mind brought on by his medication overdose. To his credit he does not allege a hypothetical conspiracy to hide or destroy evidence or present false and perjured eyewitness evidence against him, but admits he is unable to say why he cannot identify specific facts showing there is a genuine issue for trial. His attempt to do so with those portions of his declaration which contradict his

deposition testimony is legally insufficient, and his attempt to do so with those portions of his declaration which contradict his recorded interview is factually insufficient.

Without making a credibility determination regarding Plaintiff's sworn testimony, his evidence that Defendant Roddy masturbated in front of him and ejaculated onto his bedsheets is not such that a "fairminded jury could return a verdict for him on the evidence presented." *Anderson*, 477 U.S. at 255-57; *see Kennedy v. Applause, Inc.*, 90 F.3d 1477, 1481 (9th Cir. 1996) (finding that uncorroborated self-serving deposition testimony which flatly contradicts plaintiff's prior statements and the medical evidence insufficient to raise a genuine issue of fact to defeat summary judgment). Plaintiff has not come forward with evidence that Defendant Roddy took actions which amount to "unreasonable, non-consensual, inappropriate touching" of a "vulnerable," "helpless, handcuffed, and frightened" person, or that his behavior was "so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." *Fontana*, 262 F.3d at 880, 882 n.7; *Lewis*, 523 U.S. at 846.

Finally, as to Plaintiff's Fourteenth Amendment claim for invasion of privacy and sexual assault/harassment based on his allegation that Defendant Roddy touched his left buttock for "a quick second," although such touching with a sexual intent could amount to a constitutional violation, *see Rowley*, 658 Fed.Appx. at 841, Plaintiff's only evidence of sexual intent is his statement to the detectives and his deposition testimony that Defendant masturbated in front of him and ejaculated on his bed. As set forth above, he initially told the detectives that Defendant Roddy hit him in the head and raped him, then said he had not been touched, and then said he had been touched on the left buttock after which Defendant masturbated and ejaculated on his bedsheets. Plaintiff's statement to the detectives that he was never touched is somewhat ambiguous, as he may have been attempting to say he was never touched by Defendant Roddy's penis. (*See* ECF No. 89-2 at 66-67.) He stated in his deposition that Defendant touched his left buttock under his gown with one hand for "a quick second." (*Id.* at 144-47, 152.) Even assuming Defendant Roddy's hand touched Plaintiff's left buttock, Plaintiff claims a continuous course of

sexual harassment by Defendant Roddy of entering his room, threatening harm if he did not do as he was told, touching his buttock, masturbating in front of him and ejaculating on his bedsheets. Plaintiff's failure to come forward with evidence showing Defendant Roddy masturbated and ejaculated on his sheets is also a failure to come forward with evidence of sexual intent in touching his buttock.

Accordingly, to the extent Plaintiff's Fourteenth Amendment sexual assault and harassment claim rests on his allegation that Defendant Roddy touched his left buttock with one hand for "a quick second," which requires him to show Defendant Roddy's behavior amounts to "unreasonable, non-consensual, inappropriate touching" of a "vulnerable," "helpless, handcuffed, and frightened" person, *Fontana*, 262 F.3d at 880, or that his behavior was "so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience," *Lewis*, 523 U.S. at 846, Plaintiff's evidence is not such that a "fairminded jury could return a verdict for him on the evidence presented." *Anderson*, 477 U.S. at 255-57.

## IV. Conclusion and Order

Based on the foregoing, **IT IS ORDERED** that Defendant's Motion for summary judgment (ECF No. 89) is **GRANTED**.

The Clerk of Court shall enter judgment in favor of Defendant Corporal Michael Roddy and close the file.

**IT IS SO ORDERED.**

Dated: January 8, 2020

_Larry A. Burns_

Hon. Larry Alan Burns
Chief United States District Judge

17cv0127-LAB (AHG)